IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

F I L E D
JUL 10 2019
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | Criminal No. 1:19-mj-315 |
| ) | |
| MICHAEL BERNARD BAGLEY, ) | |
| Defendant. ) | |
| ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Bryce Oleski, being first duly sworn, hereby affirm and state:

### INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and I have been so employed since 2017. I am assigned to a white collar crime squad at the FBI's Washington Field Office. During my employment with the FBI, I have conducted and/or assisted in criminal investigations involving money laundering, fraud against financial institutions, private businesses, and individuals, and investigations involving wire fraud, conspiracy, money laundering, and other related federal violations of Title 18 of the United States Code. I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of affidavits in support of criminal complaints. I am assigned to the FBI's investigation of MICHAEL BERNARD BAGLEY ("BAGLEY") which concerns his involvement in a scheme to launder money for the ostensible purpose of concealing proceeds from the sale of illegal drugs, within the Eastern District of Virginia, and elsewhere.

1

2. This affidavit is being submitted in support of a criminal complaint charging BAGLEY for his business of laundering funds in violation of Title 18, United States Code, Section 1956. More specifically, as detailed further below, BAGLEY believed the cash he was laundering was the proceeds of an offense involving the manufacture, importation, and/or distribution of a controlled substance in violation of Title 21, United States Code, Section 841(a)(1).

3. This affidavit is submitted for the limited purpose of establishing probable cause. The facts in this affidavit are based on my investigation, personal observations, training, and experience, as well as information provided to me by third parties. Because this affidavit is limited in purpose, I am not including all facts known to law enforcement concerning this investigation.

4. This investigation made use of confidential informants, as further described below. Throughout this affidavit, all confidential informants and sources will be referred to in the masculine regardless of actual gender.

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

### *Background*

5. In or around January 2019, the FBI began investigating BAGLEY's involvement in a proposed scheme to launder the proceeds of drug trafficking. The FBI utilized CS-1[1] and CS-2[2] to meet with BAGLEY throughout the investigation for the purposes of conducting consensually recorded meetings. Further, on several occasions, CS-2 personally transferred more

---

[1] CS-1 volunteered to participate in this investigation in January 2019. CS-1 is not facing any charges. CS-1 has provided information that law enforcement has been able to verify through other means. His participation and information have led to the identification of multiple money laundering suspects. Based on the foregoing, I consider CS-1 to be reliable. To my knowledge, CS-1 has previously participated in other law enforcement investigations.

[2] CS-2 volunteered to participate in this investigation in February 2019. CS-2 is facing charges. CS-2 has provided information that law enforcement has been able to verify through other means. CS-2's participation and information have led to the identification of the money laundering suspect. Based on the foregoing, I consider CS-2 to be reliable. ~~To my knowledge,~~ CS-2 is participating in ~~any other~~ law enforcement investigationS.

 2

than $250,000 in cash to BAGLEY. BAGLEY believed CS-1 and CS-2 worked for a Mexican drug cartel; however, in realty, these individuals did not work for a drug cartel but were instead confidential informants for the FBI.

6. BAGLEY is a 51-year-old, white, male who resides in Alexandria, Virginia. BAGLEY's LinkedIn page indicated he is the president of "Jellyfish," which was described as a private intelligence company in the Washington, D.C., area. BAGLEY's LinkedIn profile further described Jellyfish as a "unique economic diplomacy network providing operational support to clients..." BAGLEY's LinkedIn profile also referenced the website www.jellyfishpartners.com.

7. On or about, December 19, 2018, Jellyfish Partners LLC was established in Delaware and was in good standing as of May 2019. On or about February 8, 2019, BAGLEY established a business bank account at Bank of America in the name Jellyfish Partners LLC, account ending 7183. BAGLEY is the sole signatory on this bank account.[3]

8. On or about October 13, 2012, BAGLEY and his spouse established an account at PNC Bank, account ending 4978. Both BAGLEY and his spouse are signatories on this account.

9. During the consensually monitored and recorded meetings with CS-1 and CS-2, BAGLEY discussed his ability and willingness to launder what he believed were the proceeds of drug sales on behalf of a Mexican cartel. In subsequent meetings, BAGLEY accepted cash from CS-2, which he laundered through his bank accounts for the purpose of concealing proceeds he believed to be from the sale of illegal drugs. BAGLEY's meetings with CS-1 and CS-2 for the purposes of the scheme to launder money are further described as follows:

---

[3] Records reflect BAGLEY also maintains a business bank account at JP Morgan Chase under the name Michael Bernard Bagley Capital Consulting.

*Meeting One*

10. On or about January 15, 2019, BAGLEY, accompanied by Subjects 1, 2, and 3 met with CS-1 at the Manchester Grand Hyatt hotel in San Diego, California, to discuss the possibility of laundering drug proceeds.[4] As noted, BAGLEY as well as Subjects 1, 2, and 3, believed CS-1 was a money launderer for a Mexican drug cartel. At the meeting, CS-1 unequivocally informed BAGLEY that the funds they were discussing were the proceeds of drug sales. During the meeting, BAGLEY and Subjects 1, 2, and 3 discussed various methods for laundering proceeds from the sale of drugs.

11. Shortly after the January 15, 2019, meeting, BAGLEY electronically provided CS-1 with a proposal labeled "Capital Banking Plan," which described how BAGLEY, Subjects 1, 2, and 3 proposed to launder $20,000,000 in drug proceeds through a company called Black Knight Enterprises. BAGLEY's "Capital Banking Plan" described how Black Knight Enterprises would accept $20,500,000 in cash and provide CS-1 with an "invoice for software," as a means of explaining the transfer of the $20,000,000. The Capital Banking plan BAGLEY provided CS-1 further described that $20,000,000 would be deposited in cash "at Tier 1 lawyer's IOLTA account" at Bank of America, with the remaining $500,000 to be used for "program set-up;" however, the Capital Banking Plan indicated the $500,000 would later be returned to the client upon completion of all transactions associated with the proposed money laundering platform. After 14 days, the Capital Banking Plan reflected that the client's $20,000,000 would be wired "to whatever account the Client designates (a refund of the purchase)." BAGLEY's Capital Banking plan contained a number of attachments, including a proof of funds document in the form of a November 2018 bank statement from a JP Morgan Chase account purportedly maintained by Black Knight Enterprises,

---

[4] This meeting was audio recorded. The investigation also obtained the closed circuit television recording of the lobby area of the hotel, which depicted the individuals who participated in the meeting.

LLC, which reflected an ostensible balance of $54,684,921. The Capital Banking Plan also included an Invoice for an "Enfuego Software Package" totaling $20,000,000, a draft lawyer letter of attestation, corporate documents for Black Knight Enterprises, and a copy of Subject 1's United States passport.

### *Meeting Two*

12. On or about February 7, 2019, BAGLEY met with CS-1 and CS-2 at The Westin Tysons Corner hotel in Falls Church, Virginia, to further discuss his plan to launder the proceeds from the sale of drugs.[5] During this meeting, CS-1 reiterated to BAGLEY that CS-1's business with BAGLEY was in regard to "kilos." CS-2 was introduced to BAGLEY at this meeting as the local representative of the purported Mexican drug cartel who would transfer cash to BAGLEY as part of the proposed money laundering scheme.

13. During their meeting, CS-1 explained that rather than provide BAGLEY with $20,000,000 in cash to launder, as proposed in BAGLEY's Capital Banking Plan, instead, CS-1 proposed laundering smaller amounts with BAGLEY to start as a way for BAGLEY to prove his credibility as a money launderer for CS-1's bosses. CS-1 proposed a test phase in which BAGLEY would first launder $50,000 in cash and later $100,000 in cash before ramping up to larger amounts—a plan to which BAGLEY agreed. BAGLEY accepted that he would be paid a 10% commission for the funds that he laundered.

14. During the February 7, 2019, meeting at The Westin Tysons Corner hotel, BAGLEY proposed that he could potentially launder the money through "GoFundMe," using a

---

[5] This meeting was recorded in both audio and video formats.

5

method called "smurfing."[6] BAGLEY also claimed to have a network for "mirroring," in Mexico City.[7]

### BAGLEY'S Money Laundering

15. Between on or about April 16, 2019, and on or about June 10, 2019, BAGLEY has received $251,000 in cash, which he believed were the proceeds from the sale of drugs by a Mexican cartel. BAGLEY obtained the cash from CS-2 in Alexandria, Virginia, which is within the Eastern District of Virginia.

16. To date, BAGLEY has deposited cash or transferred funds totaling approximately $205,000 ~~has been laundered~~ *be* into a bank account that BAGLEY believed was under the control of the Mexican cartel. As noted, BAGLEY's compensation for laundering the funds was 10% of the cash provided to him to launder.

17. BAGLEY has made at least one deposit in furtherance of his scheme to launder money into a PNC Bank account located at 411 King Street, Alexandria, Virginia, which is located within the Eastern District of Virginia.

*First Money Transfer to BAGLEY*

18. On or about April 16, 2019, CS-2 met with BAGLEY in Alexandria, Virginia. At this meeting, BAGLEY accepted $50,000 in cash, which he believed was the proceeds from the sale of drugs.[8] BAGLEY ultimately transferred $45,000 from his Bank of America account ending 7183 in the name Jellyfish Partners LLC to a PNC Bank account that BAGLEY believed was under the control of a Mexican cartel.

---

[6] "GoFundMe" is a fundraising website where money can be donated to support causes or people. Smurfing is the practice of breaking large amounts of money into smaller transactions to remain below financial institution reporting thresholds in an effort to avoid scrutiny from the banking system and government agencies.

[7] Mirroring is a method for transferring money between parties outside of the banking system.

[8] This meeting was recorded in both audio and video format.

19. PNC Bank also provided your affiant with surveillance photographs of BAGLEY depositing his $5,000 commission from this transaction in cash into his personal bank account ending 4978 at the PNC branch located on King Street in Alexandria, Virginia, within the Eastern District of Virginia, within approximately two hours of BAGLEY accepting the $50,000 cash from CS-2.

### *Second Money Transfer to BAGLEY*

20. On or about May 13, 2019, CS-2 met with BAGLEY for a second time in Alexandria, Virginia, for the purpose of transferring $100,000 in cash to BAGLEY to launder.[9] Financial records indicated that over the next approximately 24 days, BAGLEY deposited $90,000 into the purported Mexican cartel-controlled PNC Bank account via a combination of cash deposits, ACH deposits, and one wire transfer.

### *Third Money Transfer to BAGLEY*

21. On or about June 10, 2019, CS-2 again met with BAGLEY in Alexandria, Virginia.[10] During the meeting, CS-2 gave BAGLEY $101,000 in cash to launder on behalf of his purported employers with the Mexican drug cartel. As of July 3, 2019, BAGLEY transferred $70,000 into the supposed drug cartel-controlled PNC Bank account via a combination of cash deposits, ACH transfers, and wire transfers.

22. Also, during the June 10, 2019, meeting, BAGLEY informed CS-2: "I wanna let you know that I'm also moving for El Mayo in Mexico City as well, with his number one guy." Your affiant believes that BAGLEY was referring to laundering money for Ismael "El Mayo" Zambada Garcia, who is a suspected leader of the Sinaloa drug cartel.

---

[9] This meeting was recorded in both audio and video formats.
[10] This meeting was recorded in both audio and video formats.

23. Between on or about April 16, 2019, and June 10, 2019, BAGLEY received $251,000 in cash from CS-2, which BAGLEY believed were funds maintained by a Mexican drug cartel. As of the writing of this affidavit, approximately $205,000 of the cash BAGLEY was given has been laundered back to the bank account controlled by the purported Mexican cartel. BAGLEY retained approximately 10% of the cash as compensation for laundering the funds, and the remaining amount is still in BAGLEY's possession.

### *Search Warrant Executed at Bagley's Residence*

24. On July 10, 2019, law enforcement executed a search warrant at BAGLEY'S residence previously authorized by this Court on July 9, 2019.

25. During the execution of the warrant, BAGLEY admitted to law enforcement that he laundered what he believed to be proceeds of the Mexican drug cartel. In addition, BAGLEY signed a written confession in which he stated, in part, that:

> "I entered into an agreement with individuals I believed were associated with a Mexican drug cartel for the purposes of laundering money .... Over the course of April 2019 to the present, I accepted $251,000 from an individual I believed was associated with a Mexican drug cartel. I deposited these funds into my Bank of America acct and I transferred those funds into an account at PNC that was provided to me by an ostensible member of the cartel. I kept approximately 10% of the funds provided to me as my fee. My actions in these regards were purposeful ...."

26. Based on the foregoing, law enforcement conducted a probable cause arrest of BAGLEY.

## CONCLUSIONS OF AFFIANT

27. Based on the information provided in this affidavit, your affiant believes there is probable cause to believe that within the Eastern District of Virginia, MICHAEL BERNARD BAGLEY laundered money that he believed was the proceeds from the sale of drugs, in violation of Title 18, United States Code, Section 1956. I respectfully request that a warrant be issued for his arrest.

Respectfully submitted,

_____
Bryce Oleski
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on July 10, 2019

_____/s/_____
John F. Anderson
United States Magistrate Judge
Honorable John F. Anderson
United States Magistrate Judge