IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:19cr263 |
| | ) | |
| MICHAEL BERNARD BAGLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF FACTS**

The United States and the defendant, MICHAEL BERNARD BAGLEY ("BAGLEY"), stipulate that the allegations in the one-count Criminal Information and the following facts are true and correct. The parties further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

**I.  Factual Background**

1. MICHAEL BAGLEY resided in Alexandria, Virginia, within the Eastern District of Virginia. BAGLEY's LinkedIn page indicated he is the president of "Jellyfish," which was described as a private intelligence company in the Washington, D.C., area. BAGLEY's LinkedIn profile further described Jellyfish as a "unique economic diplomacy network providing operational support to clients . . . ."

2. On or about December 19, 2018, Jellyfish Partners LLC was established in Delaware and was in good standing as of May 2019. On or about February 8, 2019, BAGLEY

1

established a business bank account at Bank of America in the name Jellyfish Partners LLC, account ending 7183. BAGLEY was the sole signatory on this bank account.

3. On or about October 13, 2012, BAGLEY and his spouse established an account at PNC Bank, account ending 4978. Both BAGLEY and his spouse were signatories on that account.

4. In or around January 2019, law enforcement began investigating BAGLEY's involvement in a proposed scheme to launder the proceeds of drug trafficking. Law enforcement utilized two confidential informants (hereinafter referred to as CS-1 and CS-2) to meet with BAGLEY throughout the investigation for the purposes of conducting consensually recorded meetings.

5. During these consensually monitored and recorded meetings with CS-1 and CS-2, BAGLEY discussed his ability and willingness to launder what he believed were the proceeds of drug sales on behalf of a Mexican cartel. In subsequent meetings, BAGLEY accepted a total of $251,000 in cash from CS-2, which he laundered through his bank accounts for the purpose of concealing proceeds he believed to be from the sale of illegal drugs.

**II. Criminal Conduct**

6. From at least in or around January 2019, and continuing through at least in or around July 2019, in the Eastern District of Virginia and elsewhere, defendant MICHAEL BERNARD BAGLEY, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, did knowingly conduct and attempt to conduct financial transactions affecting interstate or foreign commerce involving property represented by CS-1 and CS-2, at the direction of law enforcement, to be proceeds of specified unlawful activity, to wit: the proceeds of an offense involving the manufacture, importation, and/or distribution of a controlled substance in violation of Title 21,

United States Code, Section 841(a)(1), all in violation of Title 18, United States Code, Section 1956(a)(3)(B) and 2.

### *Meeting One*

7. On or about January 15, 2019, BAGLEY, accompanied by Subjects 1, 2, and 3 met with CS-1 at the Manchester Grand Hyatt hotel in San Diego, California, to discuss the possibility of laundering drug proceeds. At the meeting, CS-1 unequivocally informed BAGLEY that the funds they were discussing were the proceeds of drug sales. During the meeting, BAGLEY and Subjects 1, 2, and 3 discussed various methods for laundering proceeds from the sale of drugs.

8. Shortly after the January 15, 2019, meeting, BAGLEY electronically provided CS-1 with a proposal labeled "Capital Banking Plan," which described how BAGLEY, Subjects 1, 2, and 3 proposed to launder $20,000,000 in drug proceeds through a company called Black Knight Enterprises. The "Capital Banking Plan" described how Black Knight Enterprises would accept $20,500,000 in cash and provide CS-1 with an "invoice for software," as a means of explaining the transfer of the $20,000,000. The Capital Banking plan BAGLEY provided CS-1 further described that $20,000,000 would be deposited in cash "at Tier 1 lawyer's IOLTA account" at Bank of America, with the remaining $500,000 to be used for "program set-up;" however, the Capital Banking Plan indicated the $500,000 would later be returned to the client upon completion of all transactions associated with the proposed money laundering platform. After 14 days, the Capital Banking Plan reflected that the client's $20,000,000 would be wired "to whatever account the Client designates (a refund of the purchase)." BAGLEY's Capital Banking plan contained a number of attachments, including a proof of funds document in the form of a November 2018 bank statement from a JP Morgan Chase account purportedly maintained by Black Knight Enterprises,

3

LLC, which reflected an ostensible balance of $54,684,921. The Capital Banking Plan also included an Invoice for an "Enfuego Software Package" totaling $20,000,000, a draft lawyer letter of attestation, corporate documents for Black Knight Enterprises, and a copy of Subject 1's United States passport.

### *Meeting Two*

9. On or about February 7, 2019, BAGLEY met with CS-1 and CS-2 at The Westin Tysons Corner hotel in Falls Church, Virginia, within the Eastern District of Virginia, to further discuss his plan to launder the proceeds from the sale of drugs. During this meeting, CS-1 reiterated to BAGLEY that CS-1's business with BAGLEY was in regard to "kilos." CS-2 was introduced to BAGLEY at this meeting as the local representative of the purported Mexican drug cartel who would deliver cash to BAGLEY.

10. During their meeting, CS-1 explained that rather than provide BAGLEY with $20,000,000 in cash to launder, as suggested in the Capital Banking Plan, CS-1 wanted BAGLEY to prove his credibility to CS-1's bosses by initially laundering smaller amounts. CS-1 proposed a test phase in which BAGLEY would first launder $50,000 and later $100,000 before ramping up to larger amounts—a plan to which BAGLEY agreed. BAGLEY also agreed he would be paid a 10% commission for the funds he laundered.

### *First Cash Delivery to BAGLEY*

14. On or about April 16, 2019, CS-2 met with BAGLEY in Alexandria, Virginia. At that meeting, BAGLEY accepted $50,000 in cash, which he believed was the proceeds from the sale of drugs. BAGLEY ultimately transferred $45,000 from his Bank of America account ending

4

7183 in the name Jellyfish Partners LLC to a PNC Bank account that BAGLEY believed was under the control of a Mexican cartel.

15. Within two hours of this meeting, BAGLEY deposited cash he believed to be proceeds from the drug cartel into his personal bank account ending in 4978 at the PNC branch located on King Street in Alexandria, Virginia, and $7,500 into the Bank of America Jellyfish account in Alexandria, Virginia, all within the Eastern District of Virginia.

### *Second Cash Delivery to BAGLEY*

16. On or about May 13, 2019, CS-2 met with BAGLEY for a second time in Alexandria, Virginia, for the purpose of transferring $100,000 in cash to BAGLEY to launder. Over approximately the next 24 days, BAGLEY deposited $90,000 into the purported Mexican cartel-controlled PNC Bank account via a combination of cash deposits, ACH deposits, and one wire transfer.

### *Third Cash Delivery to BAGLEY*

17. On or about June 10, 2019, CS-2 again met with BAGLEY in Alexandria, Virginia. During the meeting, CS-2 gave BAGLEY $101,000 in cash to launder on behalf of his purported employers with the Mexican drug cartel. BAGLEY transferred $85,000 into the supposed drug cartel-controlled PNC Bank account via a combination of cash deposits, ACH transfers, and wire transfers.

18. Between on or about April 16, 2019, and June 10, 2019, BAGLEY received total of $251,000 in cash from CS-2, and had laundered back $220,000 of the cash BAGLEY was given to the bank account controlled by the purported Mexican cartel. BAGLEY retained approximately $31,000 of the cash as compensation for laundering the funds.

*Arrest of Bagley*

19. On July 8, 2019, BAGLEY again met with CS-2 in Alexandria, Virginia. At that time, he was placed under arrest by law enforcement. BAGLEY voluntarily signed a written statement in which he acknowledged knowingly taking $251,000 from CS-2 in funds he believed to be proceeds from narcotics trafficking. BAGLEY admitted, in pertinent part, that:

> "I entered into an agreement with individuals I believed were associated with a Mexican drug cartel for the purposes of laundering money . . . . Over the course of April 2019 to the present, I accepted $251,000 from an individual I believed was associated with a Mexican drug cartel. I deposited these funds into my Bank of America acct and I transferred those funds into an account at PNC that was provided to me by an ostensible member of the cartel. I kept approximately 10% of the funds provided to me as my fee. My actions in these regards were purposeful . . . ."

### III. Conclusion

20. This statement includes those facts necessary to support the plea agreement between BAGLEY and the United States. It does not include each and every fact known to BAGLEY or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case. BAGLEY acknowledges the foregoing statement of facts does not describe all of BAGLEY's conduct relating to the offenses charged in this case.

21. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: /s/ Lamar K. Walker
Lamar K. Walker
Karen L. Taylor
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MICHAEL BERNARD BAGLEY, and the United States, I hereby stipulate the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____  8/27/19
MICHAEL BERNARD BAGLEY
Defendant

I am Bernard F. Crane, the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____  9/5/19
Bernard F. Crane, Esquire
Counsel for Defendant, Michael Bernard Bagley

7